THE HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CURTIS OSWALT and FEDERAL INSURANCE CO., <br><br> Plaintiffs, <br><br> v. <br><br> RESOLUTE INDUSTRIES, INC., <br><br> Defendant, <br><br> v. <br><br> WEBASTO PRODUCTS NA, INC., <br><br> Third Party Defendant. | IN ADMIRALTY <br><br> NO. C08-1600 MJP <br><br> **FINDINGS OF FACTS AND CONCLUSIONS OF LAW** |

This matter came on for trial on March 1 and 2, 2010, before the Court sitting without a jury. Plaintiffs Curtis Oswalt and Federal Insurance Co. were represented by Anthony J. Gaspich of Gaspich & Williams PLLC. Defendant Resolute Industries, Inc. was represented by Dennis Moran of Moran Windes & Wong, and Third Party Defendant Webasto Products, N.A., Inc. ("Webasto") was represented by Erica Krikorian of Bullivant Houser & Bailey.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW** - 1

The Court granted Third Party Defendant Webasto's motion for judgment as a matter of law after Defendant Resolute Industries announced that it wished to preserve its right to appeal the Court's summary judgment ruling in favor of Webasto but did not wish to present evidence on any other claim regarding Webasto. Following the granting of the motion for judgment, Webasto did not participate any further in the trial.

The Court then considered the evidence presented at trial, the exhibits admitted into evidence, and the arguments of counsel. The Court has weighed the testimony, exhibits and evidence using the required "preponderance of the evidence" standard. Now the Court, being fully advised in the premises, makes its Findings of Fact and Conclusions of Law as follows:

## FINDINGS OF FACT

1. Plaintiff Curtis L. Oswalt is a resident of Greenbank, Washington and owner of the M/V CHUG.

2. The M/V CHUG is a 42 foot long Krogen pleasure boat built in 1987 and docked at Skyline Marina in Anacortes, Washington.

3. Plaintiff Federal Insurance Company was organized under the laws of the State of Indiana. Its principal place of business is in Warren, New Jersey. Federal Insurance Company was the first-party property insurer of the vessel M/V CHUG and the recipient of a certificate of subrogation for monies which it reimbursed to Plaintiff Oswalt.

4. Defendant Resolute Industries, Inc. is a Washington corporation. Its principal place of business is in Anacortes, Washington. It conducts business as North Island Boat Company ("NIB").

5.      At the time of the loss, Curtis Oswalt worked as a flight attendant for Southwest Airlines.  His work assignments started and ended in Oakland, and he had to pay for hotels in Oakland at his own expense before and after each flight.  To save this cost, he used the CHUG as a second home when working in Oakland, California in the winter months.  When the loss occurred, the M/V CHUG was being readied to take to Oakland for the winter.  Unable to use the CHUG as his residence, Curtis Oswalt incurred hotel expenses.

6.      In 2006, Curtis Oswalt smelled what he believed to be coolant when he turned on the heating system aboard the CHUG.  He had experienced no prior problems with the heating system up to this time.

7.      Curtis Oswalt has no training, knowledge, or experience with Webasto heaters or heating systems and did not know what was causing this problem.  At the end of the summer season, before taking the boat to Oakland for the winter, he decided to hire a repairman to fix it.

8.      During the first week of October 2006, Curtis Oswalt asked Jeff Albrecht of NIB to troubleshoot and repair the problem before he departed.

9.      Albrecht is General Manager of NIB, a boat repair company in Anacortes.  Its office is located at Skyline Marina where the CHUG was moored.  NIB displays a Webasto sales and service sign in its storefront window and holds itself out to the public as a qualified repairer of Webasto heaters.  Albrecht told Mr. Oswalt that he was competent to repair the Webasto heater aboard his boat.

10.     Albrecht thought that the heat exchanger on the Webasto heater had developed a leak and was burning coolant when it turned on.  Albrecht told Mr. Oswalt that he would fix the problem.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW** - 3

11. Albrecht had a key to the CHUG and went aboard during the morning of October 6, 2006, to repair the heating system. No one else was aboard at that time. He entered the boat's engine space and proceeded to disassemble the Webasto heater.

12. Albrecht brought a tool bag with him aboard the CHUG that contained two current testers. He did not use the current testers or take any other action to determine that electrical power was disconnected from the Webasto heater before starting his repair.

13. The heater sits on a shelf on the after bulkhead, i.e., wall, of the engine room. The burner unit sits horizontally within the heater. Albrecht removed the burner unit and sat it vertically on end, on the shelf. This placed the burner unit pointed directly at the overhead (i.e., ceiling) of the engine compartment, with its burner tip only 2 ¼ inches away.

14. The overhead is constructed of highly flammable materials. The burner unit resembles and is effectively a "blow torch." Albrecht knew that if power had not been disconnected to the burner unit and if it turned on when left in this position, this "flame thrower" would shoot directly at the highly flammable overhead surfaced and start a fire.

15. After removing the burner unit from the heater, Albrecht received a call on his cell phone asking him to move a different boat elsewhere in the marina. He left the CHUG, got into his van, and drove away to move the other boat. Albrecht did nothing to secure the heater and left the burner unit in a position where it would start a fire if it turned on.

16. Albrecht left the boat and closed the hatch to the engine room. He was away for about 30 minutes. The power was not disconnected, the heater turned on and triggered the burner unit, directing a flame at the overhead and starting the fire.

17. Albrecht returned to the CHUG and found the boat on fire. He contacted the Anacortes Fire Department and proceeded to extinguish the fire using fire extinguishers aboard the boat.

18. The fire caused substantial damage throughout the CHUG from the flames, smoke, and extinguishing agent used to put out the fire.

19. A reasonably competent repairman should disconnect power from an electrical device he is repairing, should properly disconnect power before starting a repair, and should independently confirm that electrical power has been disconnected before attempting the repair.

20. The standard for reasonably competent electrical repair requires measures to ensure power is no longer flowing to the device. There are multiple ways to prevent power from flowing to an electrical heater. Regardless of the method used, in every instance testing to confirm that power is not flowing to a device is necessary. Failure to disconnect power to an electrical device before starting a repair can cause property damage through a fire and injury or loss of life through electrocution.

21. Albrecht's failure to ensure that the power to the heater had been completely disconnected caused the fire.

22. Albrecht's actions aboard the CHUG on the day of the fire fell below the standard of a reasonably competent repairman.

23. A review of the information available to a reasonably competent repairman shows that the Webasto heater must be de-energized before starting any repair. The Webasto repair manual plainly instructs that the heater must be de-energized before removing the burner unit. A warning is conspicuously written on the side of the Webasto heater inches

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW** - 5

from where Albrecht was standing and where he grabbed the burner unit to remove it that instructs a repairman to "Disconnect the current before opening."

24. Albrecht had multiple ways available to him to disconnect power to the Webasto unit, but failed to use any of them. The simplest was to pull out a white block connector that transfers electrical power to the Webasto heater's control unit. This process is simple to perform and access to the block connector is easily available to a repairman. Albrecht knew before the fire that unplugging the white block connector control unit would disconnect power to the unit, but did not do so.

25. Albrecht had two electrical current testers in his tool bag that he brought aboard the CHUG on the morning of the fire. He did not use either to test that power was disconnected.

26. Albrecht did not act as a reasonably competent repairman because when he departed the boat, Albrecht left the heater within inches of and pointed directly toward the highly flammable overhead of the engine compartment. Even if Albrecht did not understand how to disconnect power, failed to de-energize the heater, and failed to verify that he had left the burner unit energized, the fire would still not have occurred but for Albrecht taking the burner unit from a position of safety within the heater and positioning it where it created a certainty of causing a fire if it ignited.

27. If Albrecht had left or reinserted the burner unit back into the heater or simply left it positioned in a way such that if it turned on, the flame would shoot into the engine space, the fire would not have occurred.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW** - 6

28. Albrecht knew the overhead was highly flammable and knew the burner unit would start a fire if it turned on in the position adjacent to the overhead of the engine compartment.

29. A competent repairman should confirm through independent means that power to an electrical device like the Webasto heater has been disconnected before starting a repair, regardless of any statements made by others about a boat's wiring.

30. Albrecht relied on a vague statement made by Curtis Oswalt that a circuit breaker labeled "Boat Heat" in the CHUG's DC panel supplied all the power to the Webasto heater. Albrecht made no effort to determine if the statement was accurate or if Oswalt had a basis for his belief. A cursory inquiry with Oswalt would have revealed that the owner did not know how the boat was wired.

31. In hiring NIB, Curtis Oswalt undertook no contractual duty to provide any information about the wiring of the Webasto heater, nor did he guarantee any belief he did have about the boat's wiring was correct.

32. Albrecht made no effort to verify that the circuit breaker actually supplied power to the Webasto heater. The CHUG did not have an electrical wiring diagram. Albrecht did not ask to see an electrical wiring diagram to trace out the wire supplying electrical power to the heater before undertaking the repair. He did not check to see if the heater would turn on after shutting off the circuit breaker. He did not use available testing equipment.

33. Albrecht failed to consider that many boats are incorrectly or inexpertly wired, and that circuit breakers may be broken or not function. Although Albrecht's own experience indicated that it was necessary to inquire further, he chose not to do so before starting the repair.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW** - 7

34. Curtis Oswalt and NIB agreed to conduct a joint damage survey to determine the nature and extent of the damage to the CHUG caused by the fire and the appropriate scope of repairs. The joint survey took place on October 20, 2006, with Oswalt represented by marine surveyor David Cater and NIB represented by marine surveyor Mike McGlenn.

35. In reliance on the joint survey, Curtis Oswalt hired Granville Marine to repair the CHUG. The repairs took place in 2007.

36. To save money, Curtis Oswalt purchased various items that were approved for replacement in the joint damage survey. These amounts were reimbursed by his underwriter Federal Insurance Company, except for a $5170 deductible.

37. The repairs to the CHUG were supervised by David Cater to verify the necessity of the work and the reasonableness of the charges.

38. Oswalt chose to have an independent contractor perform the repairs. Federal Insurance Company reimbursed Oswalt for his expenses and the costs of the repairs and Oswalt in turn signed a subrogation agreement with Federal Insurance Company.

39. The costs and expenses incurred by Curtis Oswalt in connection with the fire to the CHUG are as follows:

| | |
|---|---:|
| Granville Marine (CHUG repair costs) | $ 188,002.35 |
| Apple Store (Ipod) | 412.34 |
| Bill Cobb Upholstery (upholstered cushions) | 5,674.59 |
| Fisheries Supply (range) | 1,334.03 |
| Best Buy (speakers) | 260.14 |
| Fisheries Supply (child PFD's) | 60.69 |
| Kesselring Design (drapes, shades) | 1,965.60 |
| Target (rug, stool covers) | 57.66 |
| Linen 'n Things (rugs) | 194.32 |
| Lowe's (vacuum) | 60.96 |
| Target (toaster, etc.) | 66.22 |
| Pier 1 (helm chair seat) | 10.89 |
| Linen 'n Things (duvet cover) | 43.19 |

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW** - 8

|  |  |
|---|---:|
| Home Depot (microwave) | 150.54 |
| Costco (pillows, comforter) | 145.49 |
| Fisheries Supply (books, life vests) | 989.26 |
| Floors Plus (carpet) | 470.15 |
| Fisheries Supply (charts) | 205.88 |
| Armchair Sailor (clock, etc.) | 424.71 |
| Armchair Sailor (books) | 51.07 |
| David Cater (damage survey fee) | 12,495.00 |
| Oswalt Hotel Charges | 4,110.00 |
| **TOTAL COSTS** | **$ 217,147.98** |

40. These costs were reasonable and necessary to restore the CHUG to its pre-casualty condition or otherwise constituted reasonably necessary expenses related to the fire.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction pursuant to the general maritime law and 28 U.S.C. § 1333, and venue is proper.

2. Curtis Oswalt entered into an oral agreement with NIB to repair the Webasto heater aboard the CHUG.

3. An oral contract is enforceable under maritime law.

4. An agreement to repair a vessel contains an implied warranty of workmanlike performance such that the repairer will perform his services with reasonable care, skill, and diligence.

5. Albrecht did not act as a reasonably competent repairman and was negligent in his decisions and his actions. NIB breached its warranty of workmanlike performance when carrying out the repair to the CHUG'S heater, as follows:

    (a) failing to disconnect electrical power to the Webasto heater before

        attempting the repair,

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW** - 9

      (b) failing to verify or to determine that power was secured before attempting the repair, and

      (c) moving the burner unit from a position of relative safety to a position where it was certain to start a fire if it turned on.

6. The actions of Jeff Albrecht aboard the CHUG on October 2, 2006, were the sole, proximate cause of the fire.

7. As a result of NIB's breach of its contract with Curtis Oswalt, NIB is liable for the fire and resultant damages suffered by Mr. Oswalt.

8. The implied warranty of workmanlike performance in a maritime repair contract allowed Curtis Oswalt to rely on the expertise of NIB as a ship repairer to perform the work in a reasonably competent manner regardless of the condition of the CHUG prior to it being brought in for repairs.

9. Comparative fault is not available as a defense in this breach of contract case.

10. Curtis Oswalt did not owe a legal duty to Jeff Albrecht or NIB with respect to providing information about how the Webasto heater was wired.

11. Curtis Oswalt and Federal Insurance are entitled to recover the reasonable costs of repair necessary to restore the CHUG to its pre-casualty condition.

12. The fees of a surveyor in determining the extent of damage and supervising the repairs are recoverable where these services are necessary to specify the nature and extent of repairs to be made. In re M/V Nicole Trahan, 10 F.3d 1190, 1196 (5th Cir. 1994). Curtis Oswalt's bill for the fees of the damage surveyor is entitled to be recovered by Federal Insurance through equitable subrogation since it was Federal Insurance who paid the bill for Oswalt.

13. Plaintiff Oswalt is also entitled to recover the hotel charges incurred during the winter of 2006-2007 which were reasonably necessary and related to the fire. Although the loss of use of a "private pleasure boat" is not a compensable item of damages (The Conqueror, 166 U.S. 110 (1897)), it is the use and not the type of boat that determines damages. All the maritime case law concerning the non-compensability of the loss of use of a "private pleasure boat" is distinguished by the loss of the plaintiffs' recreational enjoyment of their vessels. No party cited to a case prohibiting compensation for the loss of the use of a boat as a home. Plaintiff has provided extensive, uncontroverted documentation regarding his residential expenses incurred because the CHUG was unavailable to live aboard because of Defendants' negligence. The "pleasure" of using a boat may not be compensated, but when the boat is used as a home, the damages flowing from its loss of utility as a shelter can be calculated and compensated.

14. Plaintiffs Curtis Oswalt and Federal Insurance Co. are entitled to recover $**217,147.98** in damages for the fire to the CHUG.

15. Plaintiffs are entitled to recover prejudgment interest from the date of the fire forward to the date of the entry of judgment.

Plaintiff is ordered to prepare a judgment commensurate with these findings and submit it to the Court for signature within seven days of the filing of these findings.

Dated this __10th__ day of March, 2010.

*/s/ Marsha J. Pechman*
Marsha J. Pechman
United States District Judge